**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

NATALIA TOTROVA,

Petitioner,

v. No. 2:25-cv-01298-DHU-GBW

PAMELA BONDI, Attorney General of the United States; KRISTI NOEM, Secretary of the Department of Homeland Security; MARY DE ANDA-YBARRA, El Paso Field Office Director Immigration and Customs Enforcement and Removal Operations; TODD LYONS, Acting Director of U.S. Immigration Customs and Enforcement; and DORA CASTRO, Warden of the Otero County Processing Center,

Respondents.

**ORDER AND FINAL JUDGMENT**

THIS MATTER comes before the Court on Petitioner Natalia Totrova's *pro se* Petition for a Writ of Habeas Corpus ("Petition"). Doc. 1. Having carefully considered the parties' briefs, the record, and the relevant law, the Court will **GRANT IN PART** the Petition.

## I. BACKGROUND

This Court made initial factual findings in its Order Granting Petitioner's Motion for Temporary Restraining Order. Doc. 8 at 2-4. In that Order, the Court noted that its factual findings were based on Petitioner's facts as provided in her Petition and Motion for TRO, and that Respondents had failed to provide any information rebutting those facts. *Id.* at 2. Respondents have since provided the Court with updated facts and information. *See* Doc. 24 at 3-4; Docs. 24-1 to 24-5. The Court, therefore, now makes the following final findings concerning Petitioner's detention:

1. Petitioner Natalia Totrova is a native and citizen of Russia who arrived at the United States at the San Ysidro Port of Entry seeking asylum on January 18, 2023. Doc. 24 at 3. Since her arrival, Petitioner has accrued no criminal history. Doc. 3 at 6.
2. Upon entry, the Department of Homeland Security ("DHS") issued Petitioner a Notice to Appear, which charges her as an "arriving alien." Doc. 24 at 3.
3. Respondents believe that Petitioner's Notice to Appear was not filed with the Immigration Court, but Petitioner indicates that her Notice to Appear was filed, and that she was placed in removal proceedings. Doc. 24 at 3; Doc. 1 at 14 ¶ 45.
4. DHS granted Petitioner parole into the United States on January 18, 2023, for a period of one year. Doc. 24 at 3; Doc. 24-1. Neither party claims that DHS ever extended Petitioner's parole.
5. Petitioner's removal proceedings were transferred to the Chicago Immigration Court. Doc. 1 at 14 ¶¶ 45, 47. She timely filed an Application for Asylum in February 2023. *Id.* at 14 ¶ 47. Petitioner obtained an Employment Authorization Document, more commonly known as a work permit, for use during the pendency of her proceedings and Master Calendar hearings were set for her to attend. *Id.* at 14 ¶ 48.
6. From the time of the initiation of her removal proceedings to her re-detention, Petitioner attended her Master Calendar hearings. Doc. 3 at 6-7.
7. Nearly three years later, on November 25, 2025, Petitioner was re-detained by immigration officials outside of a hotel in Niagara Falls, New York. Doc. 1 at 14 ¶ 49; Doc. 3 at 10; Doc. 24 at 3. She was transported to the Buffalo Federal Detention Facility in Batavia, New York, and then transferred to Camp Montana Detention Facility in El

Paso, Texas. Doc. 1 at 14 ¶ 50. Her removal proceedings were transferred to the El Paso Immigration Court. *Id.* at 14 ¶ 52.

8. On December 2, 2025, Petitioner submitted a bond redetermination request with the El Paso Immigration Court. *Id.* at 14 ¶ 51.
9. On December 16, 2025, Petitioner had a bond hearing at the El Paso Immigration Court, where the Immigration Judge ("IJ") took "No Action." Doc. 24 at 3; Doc. 24-2.
10. Petitioner was subsequently transferred to the Otero County Processing Center in Chaparral, New Mexico. Doc. 1 at 14 ¶ 50. While detained at the Otero County Processing Center, Petitioner submitted a bond redetermination request with the Otero Immigration Court. Doc. 24-3. An IJ vacated Petitioner's request on January 5, 2026, noting that Petitioner had withdrawn it. Doc. 24-3.

On December 23, 2025, Petitioner filed the instant Petition. Doc. 1. In the Petition, Petitioner alleges that her re-detention is governed by 8 U.S.C. § 1226 because she was detained while residing in the United States. *Id.* at 16 ¶ 61.[1] Petitioner further argues that her re-detention violates the Due Process Clause of the Fifth Amendment. *Id.* at 21-23 ¶¶ 80-91. She specifically argues that she is protected by the Due Process Clause after living openly in the interior of the United States for nearly three (3) years and developing strong community ties. *Id.* at 21 ¶ 84, 22 ¶ 86. She further argues that, upon being re-detained, she should have been provided with a review of her individualized facts and circumstances, i.e., a bond hearing. *Id.* at 20 ¶¶ 76-79, 22 ¶ 85, 23

[1] Petitioner also argues that she is a class member entitled to a bond hearing pursuant to the final judgment entered in the class action suit, *Maldonado Bautista v. Noem*, No. 5:25-cv-01873-SSS-BFM, 2025 WL 3678485 (C.D. Cal. Dec. 18, 2025), and that Respondents have re-detained her in violation of the Administrative Procedure Act ("APA"). *Id.* at 15-16 ¶¶ 55-59, 17-20 ¶¶ 66-79. However, because the Court grants Petitioner's Habeas Petition on her Due Process claim, the Court "decline[s] to address the[se] remaining claims of error." *Scott v. Mullin*, 303 F.3d 1222, 1232 (10th Cir. 2002).

¶ 91. She request a Writ of Habeas Corpus ordering Respondents to release her within seven (7) days, or, alternatively, ordering Respondents to provide her with a bond hearing. *Id.* at 4 ¶ 10, 24 ¶ 3.

Also on December 23, 2025, Petitioner filed a Motion for TRO, requesting the same relief. Doc. 3 at 2. at The Court held a hearing on the Motion for TRO, *see* Docs. 6 and 9, and, under the initial facts before it, granted the Motion and ordered Respondents to release Petitioner after finding that Petitioner was substantially likely to succeed on the merits of her claims, that she faced irreparable harm in detention, and that the balance of the equities and the public interest weighed in favor of emergency relief, s*ee* Doc. 7.

On January 20, 2026, the Court entered an Order directing the Clerk's Office to serve Respondents, and ordering Respondents to show cause within seven (7) days of receipt of service. Doc. 18.

On January 30, 2026, Respondents issued Petitioner a superseding Notice to Appear, which reiterates her charges as an "arriving alien," and directs her to appear at the Chicago Immigration Court for further proceedings. Doc. 24-4 at 1.

On February 2, 2026, Respondents, in response to the Petition, filed a Motion to Dismiss. Doc. 24. In the Motion, Respondents argue that the Court lacks jurisdiction to hear Petitioner's claims because it would require that the Court review a § 1225(b)(1) determination. *Id.* at 11. Respondents further argue that, if the Court has jurisdiction, the termination of Petitioner's parole was lawful, and that Petitioner's due process rights, as an "arriving alien," have been met. *Id.* at 12. They request that the Court dismiss the Petition. *Id.* at 13.

Petitioner did not file a reply.

## II.
## LEGAL STANDARDS

Habeas relief is available when a person "is in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3).

The Due Process Clause of the Fifth Amendment prohibits the Government from depriving any person of liberty without due process of law. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S.Ct. 2491 (2001). The Due Process Clause's protections extend to all persons in the United States, including noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693.

The INA and its implementing regulations outline the appropriate procedures for the detention and removal of noncitizens without legal status in the United States. "Noncitizens who arrive at a port of entry without a visa or other entry document[s] . . . are deemed 'inadmissible' under 8 U.S.C. § 1182(a)(7)." *Y-Z-L-H v. Bostock*, 792 F.Supp.3d 1123, 1132 n.7 (D. Or. 2025). Once a noncitizen is deemed inadmissible, "the immigration officer must order the noncitizen's removal unless the noncitizen indicates an intention to apply for asylum or fear of persecution." *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i)). The government may place the noncitizen into expedited removal proceedings, *see* § 1225(b)(1), or into regular removal proceedings under 8 U.S.C. § 1229(a), *see* § 1225(b)(2).

Two provisions of the INA govern the detention of noncitizens with pending removal proceedings. The first, §1225, "governs the processing of noncitizens at the Nation's borders and ports of entry." *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1236 (10th Cir. 2026). This includes noncitizens subject to expedited removal under § 1225(b)(1) and certain "applicant[s] for admission" seeking admission under § 1225(b)(2). "[I]n the case of [a noncitizen] who is an

applicant for admission, if the examining immigration officer determines that [a noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] **shall** be detained" for removal proceedings, absent some extraordinary circumstances not applicable here. § 1225(b)(2)(A) (emphasis added).

However, under 8 U.S.C. § 1182(d)(5)(A), "applicants for admission may be temporarily released [into the United States] on parole 'for urgent humanitarian reasons or significant public benefit.'" *Jennings v. Rodriguez*, 583 U.S. 281, 288, 138 S.Ct. 830 (2018). The decision to grant parole is determined "on a case-by-case basis" and rests within the discretion of the Secretary of Homeland Security. § 1182(d)(5)(A). Then, "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled[.]" *Id.* Termination of parole under these circumstances requires notice, 8 C.F.R. § 212.5(e)(2), unless the noncitizen parolee departs from the United States or the time for which parole was authorized expires, in which cases parole automatically terminates without notice, § 212.5(e)(1).

## III.
## DISCUSSION

### A. The Court Has Jurisdiction

The Court briefly addresses jurisdiction before turning to Petitioner's claims. Respondents argue that this Petition requires the Court to review a § 1225(b)(1) determination, and that the Court lacks jurisdiction to do so. Doc. 24 at 11.

The INA strips courts of jurisdiction to review "any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to [§] 1225(b)(1)." 8 U.S.C. § 1252(a)(2)(A)(i). Additionally, no court shall have jurisdiction to review "a decision by the Attorney General to invoke the provisions" of §

1225(b)(1), "the application of [the] section, or "procedures and policies adopted by the Attorney General to implement" the section. *Id.* § 1252(a)(2)(A)(ii)-(iv). Although judicial review of "determinations made under § 1225(b)(1) is available in habeas proceedings," the review is limited to the following determinations: 1) whether the petitioner is a noncitizen; 2) whether the petitioner was ordered removed under § 1225(b)(1); and 3) whether the petitioner can prove by a preponderance that he is a noncitizen lawfully admitted for permanent residence, is lawfully admitted as a refugee, or has been granted asylum. *Vaupel v. Ortiz*, 244 F. App'x 892, 894 (10th Cir. 2007) (citing § 1252(e)(2)(A)-(C)).

While Respondents correctly assert that the Court does not have jurisdiction to review a § 1225(b)(1) determination, they mischaracterize the nature of Petitioner's challenge and seek to broaden § 1252's application beyond what the statutory language permits. As an initial matter, in *Vaupel*, the Tenth Circuit found it lacked jurisdiction to review an expedited removal order but did not address the appellant's challenge to his continued detention, finding it moot. *Id.* at 896. *Vaupel,* therefore, does not stand for the proposition that challenges to mandatory detention under § 1225 are beyond this Court's power to review. In fact, reading § 1252 alongside § 1225 makes clear that its jurisdiction-stripping language is focused on discretionary determinations as to admissibility and removal, not the application and legality of § 1225's mandatory detention provision. This reading is also in accord with the Supreme Court's characterization of § 1252 as aimed at protecting the Executive's *discretion* in immigration matters. *See Dep't of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 112, 140 S.Ct. 1959 (2020); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486-87, 119 S.Ct. 136 (1999).

Moreover, Petitioner here is not subject to a final order of removal; she is also not contesting any discretionary decision made by the Attorney General as to her admissibility,

credible fear or persecution, or entitlement to asylum. These are the "determinations" that §§ 1252(a)(2)(A) and (e) seek to insulate from judicial review, and they are not implicated here. Petitioner here is, instead, only contesting the legality of her mandatory detention status. This falls squarely within this Court's habeas corpus jurisdiction. *See* 28 U.S.C. § 2241; *Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) ("Challenges to immigration detention are properly brought directly through habeas.") (citing *Zadvydas*, 533 U.S. at 687-88).

**B. Petitioner's Re-Detention After the Expiration of Her Parole Was Lawful**

Petitioner argues that her parole was unlawfully revoked. Doc. 1 at 20 ¶ 76. In addition to providing for parole, Section 1182(d)(5)(A) states that "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which [s]he was paroled[.]" This seemingly grants the Executive Branch broad discretion to determine when the purposes of parole have been served and to revoke parole accordingly. However, the Supreme Court of the United States and Tenth Circuit Court of Appeals suggest that parole decisions must be individualized. *See Jean v. Nelson*, 472 U.S. 846, 857, 105 S.Ct. 2992 (1985) (requiring individualized determinations as to parole under § 1182(d)(5)(A); *Marczak v. Greene*, 971 F.2d 510, 515 (10th Cir. 1992) (same).

However, the evidence in the record shows that Petitioner's parole term expired on January 17, 2024. *See* Doc. 24 at 3; Doc. 24-1. Petitioner was detained over one year later, on November 25, 2025. Doc. 1 at 14 ¶ 49; Doc. 24 at 3. Section 1182's implementing regulations clarify that parole automatically terminates **without written notice** upon a noncitizen's departure from the United States or **at the expiration of the time for which parole was authorized**. 8 C.F.R. § 212.5(e)(1) (emphasis added). And the Tenth Circuit Court of Appeals has made clear that the Due Process Clause does not provide noncitizens in Petitioner's position with a liberty interest in being

released on parole. *See Sierra v. INS*, 258 F.3d 1213, 1218 (10th Cir. 2001). As a result, the only process with respect to parole that Petitioner is entitled to is the process provided for by statute and/or regulations. *See Thuraissigiam*, 591 U.S. at 140 (stating that noncitizens who have not "effected an entry" into the country have "only those rights regarding admission that Congress has provided by statute"). Because the statute and regulations require no notice or additional process for parolees whose parole term expires, Petitioner was not entitled to any additional process before her parole could end.

### C. Petitioner Is An "Arriving Alien" Subject to Mandatory Detention Under § 1225(b)(1)

Petitioner entered the country at the San Ysidro Port of Entry seeking asylum and is therefore an "arriving alien" as defined in the INA's implementing regulations. *See* Doc. 24 at 3; *see also* 8 C.F.R. § 1.2 ("Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry."). Before her parole, Petitioner was subject to mandatory detention under § 1225(b)(1)(B)(ii), which states that noncitizens seeking asylum who have passed a credible fear interview "**shall** be detained for further consideration of the application for asylum" (emphasis added). The INA's implementing regulations regarding parole confirm that this same provision applies after Petitioner's parole expires. Indeed, the INA's implementing regulations state that, when parole expires or is terminated, the noncitizen "shall be restored to the status that he or she had at the time of parole." 8 C.F.R. § 212.5. And 8 C.F.R. § 1.2 makes clear that parolees are "arriving aliens" and remain so even after any such parole is terminated or revoked. At least one other court in this district has found that a noncitizen detained by DHS upon revocation of his parole returned to his previous status under § 1225. *Valera-Marin v. Lyons*, No. 2:25-cv-00914-KG-GBW, 2025 WL 3687978, at *3 (D.N.M. Dec. 19, 2025) (Gonzales, C.J.). The fact that Petitioner remained in the United States after her parole expired does not subject her to §

1226, as the plain language of the statute and regulations makes clear that after her parole ended, Petitioner once again became subject to the provision of the INA mandating her detention. *See Mendibaev v. Lyons*, No. 1:25-cv-01308-DHU-GBW, 2026 WL 917457, at *4 (D.N.M. Apr. 4, 2026).

**D. The Due Process Clause Applies to Petitioner and Requires an Opportunity for Release on Bond**

1. <u>"Entry Fiction" Limits Petitioner's Due Process Rights with Respect to Admission and Parole, Not Necessarily Pre-Removal Detention</u>

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. The Due Process Clause's protections extend to **all** persons **within the United States**, including noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693 (emphasis added). However, under the "entry fiction," noncitizens "who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (citation and internal quotation omitted); *accord Sierra*, 258 F.3d at 1218. This is because such noncitizens cannot be said to have "effected an entry" into the country, so they have "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140. In *Thuraissigiam*, the Supreme Court applied this principle to a noncitizen challenging his expedited removal after he was detained just twenty-five (25) yards over the border after entering without inspection. *See id.*

The Tenth Circuit has also applied the entry fiction in the parole context, holding that noncitizens possess no liberty interest in being released on parole and therefore limiting their due process rights regarding parole to the procedures authorized by Congress. *Sierra*, 258 F.3d at 1218-

19. The facts in *Sierra* center around a Cuban citizen who was paroled into the United States, later convicted of several crimes, ordered removed, and remained detained when Cuba would not accept him back. *Id.* at 1216. After he was initially approved for parole, that approval was withdrawn after an alleged fight while in prison. *Id.* He filed a habeas petition, arguing he was entitled to a hearing on the withdrawal of his parole. *Id.* Applying the entry fiction and limiting his due process rights, the Tenth Circuit dismissed his petition because "[n]either the statutes nor the governing regulations require a hearing on parole withdrawal." *Id.* at 1219.

Petitioner in this case has not "effected an entry" into the country, like the petitioner in *Thuraissigiam*, and was instead paroled, like the petitioner in *Sierra*. Applied to Ms. Totrova, the above-cited case law makes clear that her due process rights regarding her parole and admission into the country are limited to the procedures authorized by Congress in the relevant statutes and regulations. However, the similarities stop there, and there are important distinctions that limit the applicability of *Thuraissigiam* and *Sierra*. First, Petitioner does not challenge the removal proceedings against her, nor does he argue she is entitled to be released on parole. Instead, she argues that during her nearly three (3) years of living in the United States, she accrued a protected liberty interest which entitles her to, at the very least, an opportunity to seek bond while her removal proceedings are pending. Doc. 1 at 20 ¶¶ 76-79, 21 ¶ 84, 22 ¶¶ 85-86, 23 ¶ 91.

Second, Petitioner was not arrested twenty-five (25) yards from the border shortly after entering, like the petitioner in *Thuraissigiam*, but rather was arrested in Niagara Falls, New York, after living and working freely and lawfully in the United States for nearly three (3) years. And unlike the petitioner in *Sierra*, Ms. Totrova has no criminal history and has no final order of removal. These factual distinctions are important. To apply the entry fiction in this case "requires a much greater sleight of hand than is provided for in those prior cases." *Rincon*, 810 F.Supp.3d at

112; *see also Tenamasa-Lema v. Hyde*, 810 F.Supp.3d 244, 253 (D. Mass. 2025) ("[E]ven *without* disturbing the metaphysical 'entry fiction' that may obstruct, in some senses, our ability to admit that a non-citizen is really 'here,' one can still constitutionally recognize Petitioner's actual life in this country—his years as part of our community—[is] not so easily set aside."). These facts further support distinguishing *Thuraissigiam* and *Sierra* and finding that Petitioner's due process rights with respect to her **detention pending removal proceedings** flow not from the entry fiction but from his geographic presence inside the country.

It is true that detention during removal proceedings has been upheld as "a constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523. Nevertheless, the Due Process Clause imposes limits even on mandatory immigration detention; it must "bear[] a reasonable relation to the purpose for which the individual was committed." *Id.* at 527 (quoting *Zadvydas*, 533 U.S. at 690). The petitioners in *Demore* challenged their detention under 8 U.S.C. § 1226(c), which at the time, mandated detention for noncitizens convicted of aggravated felonies. The purpose of detention, the Supreme Court found, was to ensure that noncitizens convicted of crimes appeared for immigration hearings and did not remain at large in the United States unlawfully. *Id.* at 528. No such justification applies to noncitizens like Ms. Totrova, who have no criminal history whatsoever, have pending applications for immigration relief, and possess significant ties within the United States. *See Rincon*, 810 F.Supp.3d at 113-14 (distinguishing *Demore*). Nor has the Government articulated how mandatory detention of formerly paroled asylum seekers is reasonably related to ensuring appearance in immigration court or any other immigration purpose. *See generally* Doc. 24. Accordingly, just like any other noncitizen present within the United States, the Court finds that Ms. Totrova's detention is limited by the demands of the Due Process Clause.

2. <u>Petitioner Accrued a Liberty Interest in Freedom from Immigration Detention</u>[2]

Having established that Petitioner is protected by the Due Process Clause for the purposes of her detention, we now must determine the contours of that protection in this case. Courts analyze procedural due process claims in two steps: the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivations of that protected liberty interest accords with the Constitution. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904 (1989).

The Supreme Court has said multiple times that individuals have a liberty interest in their conditional release. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593 (1972). And courts have answered the first question—whether there is a protected liberty interest—by comparing the facts of the case before them to those in *Morrissey*, where release allowed the individual "to do a wide range of things" characteristic of everyday life, including being "with family and friends and [forming] the other enduring attachments of normal life." *Id.* at 482.

Like the parolee in *Morrissey*, Ms. Totrova's parole allowed her to do a wide range of things. Petitioner developed strong community ties. Doc. 1 at 21 ¶ 84. She filed an Application for Asylum. *Id.* at 14 ¶ 47 She subsequently received a work permit and maintained employment. *Id.* at 14 ¶ 48. These relationships and obligations are the very kind contemplated in *Morrissey* and demonstrate the liberty interest accrued by Petitioner during the nearly three (3) years she lived with relative freedom in this country.

[2] The Court recognizes that Petitioner has no liberty interest in release on parole. *See Sierra*, 258 F.3d at 1218. However, the Court distinguishes between the specific interest in being paroled and a more general liberty interest in freedom from immigration detention while removal proceedings remain pending.

3. <u>Applying the *Mathews v. Eldridge* Framework, the Due Process Clause Requires that Petitioner Be Provided a Bond Hearing</u>

In analyzing what procedures sufficiently protect due process in the immigration context, courts have applied the framework established in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893 (1976). *See, e.g., Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321 (1982); *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206-07 (9th Cir. 2022) (assuming without deciding that *Mathew* applies); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020); *Hernandez v. Cremer*, 913 F.2d 230, 238 (5th Cir. 1990). Several district courts within the Tenth Circuit, too, have applied *Mathews* when addressing due process claims related to immigration detention. *See, e.g., Hernandez-Parrilla v. De Anda-Ybarra*, No. 2:25-cv-01224-MIS-KK, 2025 WL 3632769, at *5 (D.N.M. Dec. 15, 2025); *Barreno v. Baltasar*, No. 025-cv-03017-GPG-TPO, 2025 WL 3190936, at *3 (D. Colo. Nov. 14, 2025); *Garcia Cortes v. Noem*, No. 1:25-cv-02677-CNS, 2025 WL 2652880, at *4 (D. Colo. Sept. 16, 2025). To determine the process due to an individual, *Mathews* requires the Court to balance (1) the private interest affected by the official action, (2) the risk of erroneous deprivation of such interest through the procedures used and the probable value of additional or different procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. 424 U.S. at 335.

Turning to the first *Mathews* factor, the Court finds that Petitioner has a significant private interest in remaining free from detention after living freely outside of immigration custody. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. As mentioned previously, Petitioner was out of immigration custody for nearly three (3) years before being re-detained by immigration officials, during which time his interest in

release grew even stronger she lived freely alongside her community members and worked lawfully. Her private interest in freedom from detention is, therefore, substantial.

The second *Mathews* factor is a closer call. The risk of erroneous deprivation is considerable in this case where DHS previously paroled Petitioner in order to seek asylum, Petitioner's affirmative asylum application remains pending, and the Government did not extend Petitioner's parole despite her pending asylum application, compliance with the conditions of her parole, and significant community ties in the United States. On the other hand, as the Government points out, Petitioner is properly subject to mandatory detention under the statute. *See* Doc. 24 at 3-4, 11. In considering the probable value of additional or different procedural safeguards, the equities tip in favor of a bond hearing, rather than release, where the Petitioner still bears the burden of showing why release on bond is warranted in this case. This helps ensure Petitioner is not erroneously deprived of her liberty interest in release while recognizing that her detention is mandated by the statute.

Finally, the third *Mathews* factor favors Petitioner as well. While the Government certainly has a strong interest in enforcing its immigration laws, its interest in detaining noncitizens absent a rational reason for doing so is low. The justification for mandatory detention of "arriving aliens" subject to expedited removal carries little weight in this case, where Petitioner has developed significant ties to the United States and where her removal proceedings are not being dealt with in an expedited fashion. Requiring a bond hearing does not impose a significant fiscal or administrative burden on the Government, nor does it undermine the Government's "sovereign prerogative . . . to decide which [noncitizens] to admit[,]" *Landon*, 459 U.S. at 32, as Petitioner's removal proceedings—and the Government's discretion over them—will continue regardless of his detention status.

On balance, the Court finds that under the three *Mathews* factors, the Due Process Clause entitles Petitioner to an opportunity to seek release on bond at a custody redetermination hearing. However, given that the statutory scheme applicable to Petitioner contemplates mandatory detention, the Court declines to shift the burden of proof to the Government at said hearing. As is typical of custody redetermination hearings in immigration court, the Petitioner will bear the burden of demonstrating that she is not a flight risk or a danger to his community.

In requiring a bond hearing, this Court does **not** interfere with Petitioner's removal proceedings in immigration court or make any finding regarding his admissibility and/or eligibility for asylum or parole. Instead, the Court limits itself to assessing Petitioner's statutory and constitutional rights regarding pre-removal detention, which falls well within its authority to do. *See Zadvydas*, 533 U.S. at 687; *Soberanes*, 388 F.3d at 1310 ("Challenges to immigration detention are properly brought directly through habeas.").

## IV.
## CONCLUSION

For the reasons stated above, Petitioner Natalia Totrova's *pro se* Petition for Writ of Habeas Corpus (Doc. 1) is **GRANTED IN PART**. As Petitioner has been released pursuant to this Court's Order Granting Petitioner's Motion for TRO, the Court will not order that Respondents provide Petitioner with an individualized bond hearing before a neutral Immigration Judge ("IJ") within seven (7) days of entry of this Order. However, the Court will note that, should Petitioner be re-detained, she is to be provided with an individualized bond hearing.

There being nothing further to address in this matter, and pursuant to Fed. R. Civ. P. 58(a), the Court will now issue its final judgment disposing of the case.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Petitioner Natalia Totrova's *pro se* Petition for Writ of Habeas Corpus (Doc. 1) is **GRANTED IN PART**. The Clerk's Office may close this civil habeas case.

**IT IS SO ORDERED.**

HONORABLE DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE